POWELL et al. v. LEICESTER MILLS CO. et al.

(Circuit Court, E. D. Pennsylvania. July 18, 1900.)

1. PATENTS—INFRINGEMENT—KNITTING MACHINES.

The Powell patent, No. 510,934, for improvements in web-holder actuating mechanism for automatic knitting machines, claims 1 and 2, construed, and *held* not infringed by mechanism, designed to accomplish the same result, made in accordance with the Bennor patent, No. 557,641.

2. SAME—SCOPE OF PATENT.

It is not open to a patentee to claim either the effect or function of the mechanism designed by him, so as to cover any or every device for accomplishing the same result; but, to constitute an infringement, such device must operate in substantially the same way as, and be a known equivalent for, the mechanism of the patent.

3. SAME—PRESUMPTION OF NONINFRINGEMENT—ISSUANCE OF PATENT.

Where a patent has been issued for the alleged infringing device used by a defendant, he is entitled to the benefit of the presumption arising from such fact, that his device does not infringe the prior patent.

In Equity. Suit for infringement of a patent. On final hearing.

Howson & Howson, for complainants.

Hector T. Fenton, Joseph De F. Junkin, and John G. Johnson, for respondents.

GRAY, Circuit Judge. Complainants bring suit for alleged infringement by defendants of claims 1 and 2 of letters patent of the United States No. 510,934, December 19, 1893, for "improvements in web-holder actuating mechanism for automatic knitting machines." The alleged infringing machines used by defendants were made for and supplied to them by the Macon Knitting Company and Joseph Bennor, intervening defendants, and Complainants' Exhibit Defendants' Machine is one of said machines. The patent relates to improvements in that class of straight knitting machines in which the needles are arranged in two straight rows opposed to one an-

other; said needles being supported and guided upon a bed which is of the shape of an ordinary barn roof, the needles working (i. e. being successively moved up and down by means of traveling cams, one for each row of needles) in grooves whose direction is that of the rafters of the roof. The knitting is done along a line corresponding to the ridgepole, and there is a gap or slit at the ridge, through which the web of fabric goes down as fast as it is knit. In "regular" or "tubular" knitting (as, for example, in making the

foot or leg of a stocking) one row of needles is actuated to knit while the yarn carrier (i. e. the device which brings the yarn within reach of the hooks of the needles) and needle-actuating cams travel in a straight line in one direction, and the opposite row of needles is actuated to knit while the yarn carrier and cams are traveling in a straight line in the reverse direction, so that in this "regular" operation of the machine each of the two sets of needles is alternately active and idle. But, in the operation of such a machine to produce a stocking, the first step is the "setting-up" course, in which the

needles of both rows are simultaneously actuated to seize the yarn, and hold it in a zigzag line within their hooks. This delivery of the yarn to both sets of needles is accomplished by so adjusting the needle-actuating cams that during that one movement of said cams, from end to end of the machine, the needles of both rows are thrust forward to receive the yarn, and drawn back to hold it; the needles in this step of the operation being advanced to a less extent than in regular or tubular knitting. This setting-up operation, requiring the thrusting forward of the needles of both of the two opposite sets, makes it necessary to arrange the needles of each row op-

posite, not the needles, but the spaces between the needles of the opposite row. This is a distinguishing characteristic of the class of machines to which the invention of the patent relates, and is that upon which depends the capacity of such machines to knit a tube closed at one end, so as, for example, to produce automatically, at one continuous operation, a stocking with closed toe and heel. Thus, in making a stocking, one of these machines operates (1) to produce a single setting-up or starting course by the simultaneous operation of both sets of needles; (2) to make the toe and the heel by the operation of one set only of the needles knitting during the travel

of the cam carriage or knitting head in both directions; and (3) to make the foot and leg by alternate operations, first of one and then of the other set of needles, each set knitting in one direction only. These operations, and the change from one to the other, are effected automatically by needle-actuating cams, and the shifting of said cams from one position to another by means of slide bars (G, G', in the patent), which slide bars are themselves shifted by contact with

FIG. 1.

FIG. 4.

suitable stops on the machine just before the sliding heads reach their limit of movement in either direction.

The web or fabric, as it is being formed, is held down while the needles are thrust forward to receive new loops by means of pivoted hooks or fingers called "web holders" or "sinkers," one to each needle. These web holders or sinkers (b, b', in the patent. See Fig. 1, drawing) are successively raised by means of a traveling cam

which acts to raise each web holder just after the needle beside it has passed through its loop to receive yarn for another loop, and they are then successively lowered by means of cams or springs. It is to the web-holder or sinker mechanism that the patent in suit particularly relates, as the title, "Improvements in Web-Holder Actuating Mechanism," indicates.

In the specification of the patent in suit, the patentee, one of the complainants in this case, states his invention as follows:

"My invention consists of a certain improvement in knitting machines of the class represented in patent No. 440,389, dated November 11, 1890, my present improvement consisting of a modified means of operating the web holders, all as fully set forth and specifically claimed hereinafter."

The patent No. 440,389, referred to, was issued to Joseph Bennor, assignor, and one of the intervening defendants in this case. It is very comprehensive, and embodies the principal mechanisms upon which have been ingrafted the improvements of the patent in suit, as stated in the specification of the patentee, just quoted, as also the improvements claimed by Bennor, the patentee himself, in a subsequent patent, in accordance with which the alleged infringing machine is constructed. The specifications of the patent state that in the prior art, as illustrated by the machine of patent 440,389, November 11, 1890, "these web holders operated continuously, so that both sets of web holders were actuated when but one set of needles was in operation at a time. This was objectionable, not only because of the wear of the parts, but mainly because it prevented the setting of the web holders of one head directly opposite the needles of the other head, because of the interference of one with the other in their movements, and thus necessitated the making of the machine of coarse gauge." It is for the infringement of the patent, as covering a device to remedy this, that this suit is brought; the complainant averring that prior to the invention of the patent in suit no knitting machines of this class were capable of producing fine-gauge work. The machine of the patent in suit is claimed to have accomplished this, by the inventor having conceived the idea of placing the sinkers or web holders out of operative position on the inactive side of the machine, so that they should not come in contact with the advancing needles of the active side, and his having devised a mechanism to accomplish this result. As the needles on the active side of the machine could not, by this arrangement, come in contact with the sinkers of the inactive side, which were thus kept lowered, there was no necessity to provide space between the needles for the play of such opposite sinkers, and the needles could therefore be placed closer together, for the production of finer work.

Claims 1 and 2 of the patent in suit—the only ones involved in the controversy here—are as follows:

"(1) In a machine having two opposite sets of needles, working alternately for the production of tubular web, and movable web holders for each set of needles, the combination of said needles and web holders, with cams for operating the latter, and with means for throwing said cams into and out of operative position, whereby each set of web holders may be caused to work only

when its own set of needles is in action, substantially as specified. (2) In a machine having two opposite sets of needles. working alternately for the production of tubular web, and simultaneously for the production of a setting-up course, and movable web holders for each set of needles, the combination of said needles and web holders, with cams for actuating the latter, and means for throwing one set of cams into action during one movement of the head, and the other set into action during the opposite movement of the head, and means for throwing both sets of cams out of action simultaneously during the one movement of the head, devoted to the formation of the setting-up course, substantially as specified."

To the charges of infringement made by the bill, the defendants, while setting up in their answer the usual defense, in their proofs rely only upon the single one of noninfringement, and to this alone, in the contentions of their brief, confine themselves. Does the sinker-operating mechanism of defendants' machine, as displayed in the exhibit before the court, and admitted to have been used with others of like character by the defendants, constitute an infringement of the rights secured to complainants by patent 510,934? The consideration of this single but broad question will make necessary a determination by the court of the proper construction to be given to claims 1 and 2, above quoted, and of the extent of the monopoly granted by the patent in suit. It must be borne in mind at every stage of the discussion that the patent in suit is not for a knitting machine, or for any invention of a primary character opening up or occupying a new field in industrial art. Knitting machines of this class were well known in the prior art, and had been developed by successive inventions until the principle involved was well understood and embodied in mechanisms in general character like those largely used to-day in the knitting industry. Among the inventors who have contributed to this development was Joseph Bennor, one of the defendants. The testimony abundantly establishes his important relation to the art, and also the fact that for a number of years he was in the employ of the complainants, and while there invented, used, and had patented a knitting machine, the patent for which is No. 440,389. It is also in testimony that under this patent the complainants manufactured many machines, and it was professedly for a "certain improvement" of the machine represented in this patent that the patent in suit was granted; the patentee stating, as above quoted:

"My invention consists of a certain improvement in knitting machines of class represented in patent No. 440,389, dated November 11, 1890, my present improvement consisting of a modified means of operating the web holders, all as fully set forth and specifically claimed hereafter."

The general character of this improvement has already been sufficiently stated for our purposes. The first claim of the patent, which is for a "combination of said needles and web holders, with cams for operating the latter, and with means for throwing said cams into and out of operative position," does not particularly describe the "cams" or the "means" for throwing the cams into and out of operative position, and for this reason is claimed by complainants to be entitled to a very broad construction; that is to say, that the invention is broader than as described in the specifications. The device described in the patent and drawings consists

of a sliding T head, in which one of the cams, marked f, f, is placed, reciprocating with a corresponding cam, marked d, d, rigidly fixed on the carriage, with recesses, marked s, s, into which the projections, f, f, of the sliding cam are retracted when the sinkers are intended to be kept out of operation. When this sliding T head, on which is the cam, f, f, is pushed forward, both cams then operate to bring the sinkers into action by engaging their butts between the reciprocating cams. It is this device of a T head, moving transversely to the motion of the carriage, and according as it is pushed out or retracted into the recesses, s, s, actuating or holding down alternately the web holders or sinkers, that is the subject of invention, as described and illustrated in the specifications and drawings of the patent. This was the specific mode in which the patentee of the patent in suit improved the generic knitting mechanism, in order to make it a closer-gauged machine. Prior to his invention, as described in the patent in suit, he had adopted another mode of accomplishing the same result; i. e. of throwing the sinkers out of operation on the inactive side of the machine, and thus out of range of the needles of the opposite side. This was done by having the long, grooved cam bar on the machine of 440,389 altered, by applying mechanism whereby the said grooved cam bar on the inactive needle side shall have a lost motion laterally, so that its cams would not be brought into contact with the butts of the sinkers which for the time being happened to be opposite the section of projected needles on the opposite side of the machine. This device was the subject of patent 523,867, which, though applied for before, was not issued until after, the patent in suit. This, then, was another and distinct mode of accomplishing the same result by an improvement on the generic machine; i. e. making possible a closer adjustment of the needles, and a consequently closer gauge in the fabric produced. The desirability of removing the sinkers on the inactive side from possibility of contact with the needles on the active side of the machine must have been obvious to any one skilled in the machine-knitting art, and any efficient device for the accomplishment thereof was entitled to the protection of the patent laws. The device just referred to was the subject of a separate patent, and is not claimed to be covered by the invention of the patent in suit. Though one of the defendants, Bennor, invented and patented in 440,389, and also in 485,317, the underlying and essential principle and mechanism, the complainant was not precluded from claiming his improvement thereon. But he may not on that account claim a monopoly of the function or result of his improvement, and prevent any other person (much less, Bennor himself) from improving his own machine by devising other and different mechanisms to produce like results.

This brings us to the question whether defendants' machine, as produced and admitted in evidence, is an infringement of the device of the patent in suit. This alleged infringing machine was the subject of a patent (being No. 557,641, to one of the defendants, Joseph Bennor), application for which was filed September 1, 1892. In the invention so patented the patentee has undoubtedly devised an improvement of the generic machine for accomplishing substan-

tially the same result as the device of the patent in suit. By it the sinkers on the inactive side are not actuated by the sinker cam, because it is lifted out of contact with their butts during the period of inactivity, and they are held down in their inactive position by springs, one of which is attached to each sinker. This function of holding down the sinkers during the inactive period is performed in the patent in suit by the outer edge of the movable cam being brought flush with the upper edges of the immovable cam, d, when the former is retracted into the recesses, s, s, of the latter. A straight surface is thus pressed against the butts of the sinkers as the carriage passes, and holds them in line and out of operation. Before the date of the patent in suit, and in the machines as devised by Bennor, there was mechanism for throwing out of actuating position the needle cam when the needles on either side were desired to be inactive. The defendants' machine, as devised and patented by Bennor in patent 557,641, presents a mechanism by which both the needle cam and the sinker cam are simultaneously, and by the same movement of the actuating bar, lifted out of operative position on the side desired to be inactive. This is done by uniting the parts of the carriage holding the needle bed and operating cams, and the sinker-operating cams, so that, as a unitary structure and part of the carriage, it can be hinged at the lower side of the barn-roof incline, so as to give a swinging motion to the whole, through a small arc, when raised at its outer or higher side by the automatic device for so doing. This raising or swinging of the part of the carriage holding the needle cams and the sinker cams necessarily places the sinker cams out of range of and contact with the sinker butts whenever the needles on that side are inactive, as the needle cam is thrown out of operative position by the same movement. The sinker cam is rigid relatively to the swinging part of the carriage, having no transverse movement, as in the case of the patent in suit, and the sinkers are held in depressed position by the springs already mentioned; no reciprocating cam bar, d, being used for that purpose, as in the device of the patent in suit. This is plainly a different mode of accomplishing the object of keeping the sinkers inactive when the needles on the same side are so, from that set forth in complainants' patent; and, unless the claim of that patent is broad enough to cover it, it does not invade the field of monopoly secured to complainants. The complainants contend that their invention, as set forth in claim 1 of the patent, is broad enough to so cover defendants' device; that, whatever the means may be by which the sinker cams are made inoperative during the inactivity of the needles on the same side, they are included in the monopoly secured by the patent in suit. The claim relied on for this contention is claim 1, and is as follows:

"(1) In a machine having two opposite sets of needles, working alternately for the production of tubular web, and movable web holders for each set of needles, the combination of said needles and web holders, with cams for operating the latter, and with means for throwing said cams into and out of operative position, whereby each set of web holders may be caused to work only when its own set of needles is in action, substantially as specified."

Plainly, this claim, in order to be understood, must be read together with the specific mechanism described in the specifications of the patent. It is impossible to identify the invention claimed, otherwise. The words "substantially as specified," while not referred to in order to narrow the claim, must be held in this case as serving to connect the general language used with such parts of the specifications as will serve for identification, and to translate what is vague in the claim into what is concrete and comprehensible. The first half of the claim refers entirely to the primary machine invented by Bennor, one of the defendants, and contains nearly all the mechanism of complainants' machine; the only addition made thereto by complainants being the cam bar, d, and the making movable the T head holding the cams, f, f, which were stationary in the original machine. Unless this mechanism or device be the invention described and claimed by the patent in suit, then we must concede to complainants either that the alternating "operative and inoperative positions" of the sinker-raising cam, however produced, is their invention, or that the mere motion or movement of the sinker-raising cam into or out of operative position is such invention. But for such a claim there is no warrant in this case or at all. It is not open to the patentee, in reason or in law, to claim either the effect or function of the mechanism designed by him to produce such effect or perform such function. In the case of the patent in suit, as well as in the alleged infringing machine of the defendants, the effect or end result, which must be taken to have been in the inventor's mind, is the inoperative position of the sinker cam and sinkers on the inactive side of the machine. It is true that this position was an end sought to be brought about, not for its own sake, but as a condition precedent to a closer placing of the needles, which closer placing was, in its turn, a necessary condition to the producing of a fine-gauge fabric; but it is not required that we should seek an absolutely ultimate end, if that were possible, but only the natural and immediate result of the mechanism in question. In the case before us, this was, as we have said, the nonoperative position of the sinker cam and sinkers during the period when the needles were inoperative on that side. This was the obvious desideratum in the machines as already constructed, and, as a matter of fact, was recognized as such by Joseph Bennor as early as December, 1891, and set forth in his letter of that date to the complainants in this suit. It is necessary, therefore, that we should so read the latter half of the first claim of the patent, which alone refers to any improvement in the primary machine, in connection with the specifications, as to enable us to identify the mechanism invented and claimed by the complainants. Doing so, we find that in a machine in all of its main features similar to the old machine devised by Bennor, and long in use, the complainant Powell has made movable the T head, carrying the open cam bar, of the old machine, so that it shall slide backwards and forwards transversely to the line of movement of the carriage in which it is placed, and be made to reciprocate with the cams of a cam bar, d, d, rigidly fixed to the carriage. This movement backwards and forwards is so devised that, when actuated by appropriate cam mechanism, the sinker-cam T head can be so retracted into the recesses, s, s, of the cam bar, d,

that the sinkers, during the inactivity of the needles on that side, will be depressed and held in that position by the cam bar, d, co-acting with the cam bar, f, f, until, when the needles become again active, the T head cam bar is thrust forward into such position as to allow the cams to engage the butts of the sinkers, and so operate the same in connection with the needles.

Complainants say in their brief, "The soul of the invention—the happy thought—was the idea of making what had previously been, for all operative purposes, a fixed cam, a shifting cam." But the thing sought or the result aimed at was an efficient shifting or moving out of operative contact of the sinker cam and the butts of the sinkers during the inactivity of the needles on that side. The happy thought of the patent was the device or mechanism there set forth, to accomplish such shifting or movement. The patent was for the device, and not for the movement, as it could not lawfully be. It is this efficient device of a transversely sliding T head, carrying a cam co-acting with a fixed cam, that is the invention claimed and described in the patent in suit; and the result or effect of such device, when actuated at the times required, is to move out and keep out of operative position the sinker cams. It is this particular device for producing the result, and not the result or effect itself, that is patented. "It is for the discovery or invention of some practicable method or means of producing a beneficial result or effect that a patent is granted, and not for the result or effect itself." Corning v. Burden, 15 How. 252, 14 L. Ed. 683. In Le Roy v. Tatham, 14 How. 156, 14 L. Ed. 367, the court say: "A patent is not good for an effect, or the result of a certain process, as that would prohibit all other persons from making the same thing by any means whatsoever." Complainants cannot be permitted, by the use in their contention of the word "shifting," as applied to the movement of the cam out of operative position, to so broaden the scope of the invention as to cover any or every other device for effecting that movement, and so, practically, to obtain more than the patentee invented, and more than the patent can give. Even if it were allowable to claim, under this use of the word "shifting," the intermittent movement of the sinker cam out of operative position, irrespective of the mechanism by which such movement or motion is effected, it is to be observed that the claims do not use the word, and nothing elsewhere in the patent justifies the claim of such an invention or the monopoly of such a thought. The defendants' means or method of producing this effect is different altogether from the device of the patent in suit. Instead of a transversely sliding bar or T head, the T head on which the sinker-raising cams are fixed is rigid, and has no motion relatively to the carriage. It is true that the effect or result of automatically placing the cam in alternately operative and inoperative positions, according as the needles on that side are active or inactive, is accomplished, as it is also accomplished by the device of the patent in suit. This, however, is done by raising or swinging through a small arc the upper end of the carriage on which the needle bed and sinker cams are fixed, so as to move out of operative position simultaneously the needle cam and sinker cam of one side. There is no sliding of a T head backward and forward into and out of the recip-

rocating recesses of the fixed cam bar, d. While the invention of complainants is a meritorious one, it occupies no such position in the art as to give it claim to anything more than a fair and unstrained application of the doctrine of equivalents. The thing to be done, or the effect aimed at, was, at a certain period of the knitting operation, to get the sinker cam bar out of operative position. One means of doing so was the transverse sliding motion of the T head, and that was the means of the patent in suit. Another means was that of "dragging" the long cam bar of the primary machine, so as to prevent its operating the section of sinkers opposite a section of active needles; and that was the method of complainants' first applied for, but later issued, patent No. 523,867. While another means of getting the sinker cam out of position to operate the sinkers at the times required was to raise the end of the carriage, in which both sinkers and needles were operated, and thus lift, instead of slide, the sinker cam out of operative contact with the needles. This latter differs from both the other means, in that it depends upon a lifting or swinging motion, and not upon the sliding motion, keeps the T head in a fixed position, relative to the carriage, instead of a shifting one, and does away with the cam bar, d, of the patent in suit, which, co-acting with the movable cam bar when retracted into its recesses, serves to hold the sinkers in their depressed position. In the defendants' machine this holding down of the sinkers in their depressed or normal condition is accomplished by springs, against the resiliency of which they are raised by the sinker-raising cam. It is difficult to see how any doctrine of equivalents can apply to a device so simple and of such narrow scope as that of the patent in suit, or be invoked, as here, without claiming for the patentee more than he had invented, and more than he had a right to claim. Unless a means of accomplishing the result aimed at, as different from that described in the patent in suit as that of the defendants' machine, is considered an essentially independent and nonequivalent device, the complainants could prevent the employment of any means by Bennor, the patentee of the primary machine, to improve his machine for the end and purpose in view, as well as all other persons. Such a result would be injurious to the further progress of the art in question and to the public. The patent laws were not designed to produce such results, and should not be so construed. The defendants' device cannot be read out of the patent of complainants. "The specification of the patent particularly pointing out an invention to which the claim and every element thereof is presumably referable, there being no other invention particularly pointed out to which the claim can refer, we are justified in concluding that the disclosure of the specification and the subject-matter of the claim are the same, and together constitute a compliance with the statutory mandate, that the patentee 'shall particularly point out and distinctly claim the part, improvement, or combination which he claims as his invention or discovery.'" Computing Scale Co. v. Keystone Store-Service Co. (C. C.) 88 Fed. 788.

The claim and the specifications being thus read together, we think no one can properly identify the device of the patent in suit in the defendants' machine. The defendants' machine has no cam bar, d, nor any mechanical equivalent therefor. It has no shifting

or movable T head, holding cams that co-act with the cams of the cam bar, d, moving out transversely to the line of motion of the carriage. On the contrary, defendants' machine has the short, open, raising cam, mounted on the carriage, and working in combination with springs attached to the sinkers, which is characteristic of the construction called for and described in defendants' own prior patent, 485,317, and it has no movement relative to the carriage at all. The only movement upon which defendants rely to get this open cam out of operative position is that imparted to it by the lifting of the carriage itself. We can discover no equivalency of mechanism here. The equivalency contended for by complainants is in reality an equivalency of result and function. Complainants cannot claim any and every mechanism which will result in not vibrating the sinkers on the inactive side. That is a function or effect. No more can they be heard to claim any and every mechanism which will move the sinker cams out of their normal position in which they would otherwise vibrate the sinkers. That is a function. In Miller v. Manufacturing Co., 151 U. S. 203, 14 Sup. Ct. 310, 38 L. Ed. 121, the supreme court say, "Merely because two things operate to perform the same function or accomplish the same result, they are not necessarily the same." In Clough v. Barker, 106 U. S. 166, 1 Sup. Ct. 188, 27 L. Ed. 134, the court held that the compared device, in order to be an equivalent, must "perform the same office in substantially the same way as, and be a known equivalent for," the patented device. The cam bar, d, in the patent in suit, could not possibly be substituted for, or perform the office of, the springs in the defendants' machine.

It is not denied that the defendant's machine is specifically described in his patent 557,641, and also in his companion patent of the same date, 557,639, and is there described as an improvement upon defendant's prior machine, for which patents 485,316 and 485,-317 were issued. Among the improvements stated is one relating to "a construction of the cam carriage, the knitting cams, and the means for controlling the same." The second patent named states that it relates, inter alia, to "a novel construction and arrangement of sinker mechanism." These patents were granted to defendant two years and four months after the date of the patent in suit. The grant is to be presumed to have been made after a full examination by official examiners, with the prior state of the art fully in view, especially as the same is shown by previously granted patents. There can be no reason why the presumption of validity and noninterference with any prior patent should not obtain as strongly in defendant's favor as it does in favor of the patent in suit. In considering the weight of the testimony, as to all points bearing on the question of infringement, this presumption must be kept in view. The cases cited by counsel for the defendants in this regard fully sustain this proposition. In Corning v. Burden, 15 How. 252, 14 L. Ed. 683, the supreme court say:

"In cases where the evidence is nicely balanced, it [the defendant's patent] may have weight with the jury in making up their decision as to the plaintiff's rights; and, if so, it is not easy to perceive why the defendant, who uses a

patented machine, should not have the benefit of a like presumption in his favor, arising from a like investigation of the originality of his invention, and the judgment of the proper officers, that his invention is new, and not an infringement of the patent granted to the plaintiff."

Boyd v. Tool Co., 158 U. S. 260, 15 Sup. Ct. 837, 39 L. Ed. 973; American Nicholson Pavement Co. v. City of Elizabeth, 4 Fish. Pat. Cas. 189, Fed. Cas. No. 312; Kohler v. George Worthington Co. (C. C.) 77 Fed. 844; Ney Mfg. Co. v. Superior Drill Co. (C. C.) 56 Fed. 152; St. Louis Car-Coupler Co. v. National Malleable Castings Co., 31 C. C. A. 265, 87 Fed. 885; Illinois Steel Co. v. Kilmer Mfg. Co. (C. C.) 70 Fed. 1012.

In the case last cited, the court said, comparing the complainant's with the defendant's machine:

"It was contended that these differences in construction and operation were immaterial, and that defendant's devices were equivalent to those of complainant. * * * The mill of the defendant was built under [his] patent. The grant of this later patent for a machine designed to accomplish the same result as that of the patent in suit raises a presumption that there is a substantial difference between them, and that the later is not an infringement of the earlier patent."

The charge here is that defendants have intentionally infringed; i. e. committed a tort. The burden of establishing this charge is upon the complainants, and, for the reasons above stated, that burden is materially increased by the fact in the cause that for the alleged infringing mechanism one of the defendants has had issued to him from the patent office a patent. The presumption arising therefrom in favor of defendants has not, in the opinion of the court, been overcome by complainants, nor the general burden of proof sustained by them of satisfactorily showing an infringement by defendants as charged.

It will not be necessary to resort to separate and independent discussion of the alleged infringement of claim 2. What has been said in regard to the scope of claim 1, and its lack of identity, when read in connection with the specifications, with the device of defendants' machine for accomplishing the same result, must throw claim 2 of the patent in suit entirely out of relation to defendants' machine. That is to say, claim 2 of the patent in suit refers to "means for throwing both sets of cams out of action simultaneously, during the one movement of the head devoted to the formation of the setting-up course," in combination with the device of claim 1; the additional element being merely the "special stop," which operates to throw both sets of cams out of action at the same time, instead of alternately. It is quite obvious that claim 2 is for a true combination of the element of claim 1 with this new element (the special stop). If, therefore, defendants' machine does not contain the element of claim 1, it is impossible for that element to be present as an element of the so-called combination of claim 2, and hence does not infringe that claim. It is the opinion of the court that the complainants' case is without equity, and that the bill should be dismissed, with costs.